*FILED*
09 MAY -5 AM 11: 48
RICHARD W. ...
CLERK U.S. DISTRICT ...
NORTHERN DISTRICT ...

1  Shana E. Scarlett (217895)
   HAGENS BERMAN SOBOL SHAPIRO LLP
2  715 Hearst Avenue, Suite 202
   Berkeley, CA 94710
3  Telephone: (510) 725-3000
   Facsimile: (510) 725-3001
4  shanas@hbsslaw.com

5  Robert B. Carey
   Leonard W. Aragon
6  HAGENS BERMAN SOBOL SHAPIRO LLP
   2425 East Camelback Road, Suite 650
7  Phoenix, Arizona 85016
   Telephone: (602) 840-5900
8  Facsimile: (602) 840-3012
   rcarey@hbsslaw.com
9  leonard@hbsslaw.com

10 Stuart M. Paynter (226147)
   THE PAYNTER LAW FIRM PLLC
11 1200 G Street N.W., Suite 800
   Washington, DC 20005
12 Telephone: (202) 626-4486
   Facsimile: (866) 734-0622
13 stuart@smplegal.com

14 Attorneys for Plaintiffs

15 [Additional counsel listed on signature page]

E-filing
Fax Filing
by
Wheels of Justice

16

17              UNITED STATES DISTRICT COURT            CW

18              NORTHERN DISTRICT OF CALIFORNIA

19 SAMUEL MICHAEL KELLER, on behalf of )  No.
   himself and all others similarly situated, )
20                                          )  CV 09 - 1967
                                   Plaintiff, )
21                                          )  CLASS ACTION COMPLAINT
            v.                              )
22                                          )
   ELECTRONIC ARTS, INC., NATIONAL          )
23 COLLEGIATE ATHLETICS ASSOCIATION; )
   COLLEGIATE LICENSING COMPANY,            )
24                                          )  DEMAND FOR JURY TRIAL
                                  Defendants. )
25                                          )
                                            )
26                                          )
   _____ )
27

28

010123-11 301644 V3

Plaintiff, by and through his attorneys, based on his individual experiences, the investigation of counsel, and upon information and belief alleges as follows:

## I.    INTRODUCTION

1.    This suit arises out of the blatant and unlawful use of National Collegiate Athletic Association ("NCAA") student athlete likenesses in videogames produced by Electronic Arts. Despite clear prohibitions on the use of student names and likenesses in NCAA bylaws, contracts and licensing agreements, Electronic Arts utilizes the likenesses of individual student-athletes in its NCAA basketball and football videogames to increase sales and profits. Electronic Arts also intentionally circumvents the prohibitions on utilizing student athletes' names in commercial ventures by allowing gamers to upload entire rosters, which include players' names and other information, directly into the game in a matter of seconds. Rather than enforcing its own rules, the NCAA and its licensing arm, the Collegiate Licensing Company ("CLC"), have sanctioned Electronic Arts' violations. In fact, the NCAA and the CLC have expressly investigated and approved Electronic Arts' use of player names and likenesses. They have done so because Electronic Arts' use of player names and likenesses benefits the NCAA and the CLC by increasing the popularity of the relevant games and thus the royalties that the NCAA and CLC can collect.

2.    This is a proposed class action on behalf of NCAA student-athletes whose likenesses and distinctive appearances have been used without their permission or consent, to increase revenues and profits for the Defendants, and in violation of state law.

## II.    PARTIES

3.    Plaintiff Sam Keller, an individual, is an Arizona resident and the former starting quarterback for the Arizona State University and University of Nebraska football teams.

4.    Defendant Electronic Arts, Inc., a Delaware corporation, is a multi-billion dollar interactive entertainment software company that produces the NCAA Football, NCAA Basketball and NCAA March Madness videogame franchises. It describes itself as the "world's leading interactive entertainment software company." Its revenues support this claim. In just one fiscal year (2008), Electronic Arts posted net revenues, calculated under GAAP, of $3.67 billion. Electronic Arts' principal place of business is Redwood City, California.

CLASS ACTION COMPLAINT                                      - 1 -

010123-11 301644 V3

5.      Defendant NCAA is an unincorporated association that acts as the governing body of college sports. Although it describes itself as "committed to the best interests . . . of student athletes," the NCAA's true interest is in maximizing revenue for itself and its members, often at the expense of its student athletes. While extolling the virtues of "amateurism" for student athletes, the NCAA itself runs a highly professionalized and commercialized licensing operation that generates hundreds of millions in royalties, broadcast rights and other licensing fees each year. The annual revenues for the NCAA in fiscal year 2007-08 were $614 million. Almost 90% of the NCAA's annual budget revenues stem from marketing and television rights, with only 9-10% coming from championship game revenues. The NCAA's operations are also highly profitable. The direct expenses for operating the actual games that generated the $614 million in revenues was only $59 million

6.      The Collegiate Licensing Company, a Georgia corporation headquartered in Atlanta, Georgia, is the nation's leading collegiate trademark, licensing, and marketing company. The CLC represents nearly 200 colleges, universities, bowl games, and athletic conferences, including the NCAA. Its primary service is to market and sell its clients

### III.      JURISDICTION AND VENUE

7.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000, and Plaintiff and other putative Class members are citizens of a different state than the Defendants.

8.      This Court has personal jurisdiction over the Plaintiff because Plaintiff Sam Keller submits to the Court's jurisdiction. This Court has personal jurisdiction over the Defendants because Defendant Electronic Arts is headquartered in the District and Defendants CLC and NCAA conduct substantial business in the District. Furthermore, many of the actions giving rise to the complaint took place in the District, to include the creation of the software that is the subject of the complaint.

9.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendants, as corporations, are "deemed to reside in any judicial district in which they are subject to personal jurisdiction," and because many of the decisions behind the scheme to use student-athletes' names

and likenesses were made in this District. Because Electronic Arts resides in the District, Defendants all transact business within the District, and a substantial part of the events giving rise to the claims arose in this District, venue is proper.

10. Intradistrict Assignment: Assignment to the San Francisco or Oakland division of this Court is appropriate because Defendant's headquarters and principal place of business is in Redwood City, California. Because this action arises in the county of San Mateo, pursuant to Northern District of California, Local Rule 3-2(d), assignment to either the San Francisco Division or the Oakland Division is proper.

## IV. UNLAWFUL CONDUCT COMMON TO THE CLASS

11. Electronic Arts produces the NCAA Football, NCAA Basketball and NCAA March Madness videogame franchises. Videogame titles within these franchises simulate basketball and football matches between NCAA member schools. Consumers demand that these matches simulate actual college matches in the most realistic manner possible. In the words of CLC President Pat Battle: "A failure to keep up with technology and take full advantage from a consumer standpoint may make the NCAA [video game] titles less valuable." As a result, each year Electronic Arts spends millions of dollars to ensure the realism of the games, and advertises this realism in the promotion of its products. Specifically, pursuant to a license with the CLC, the NCAA's licensing company, Electronic Arts replicates team logos, uniforms, mascots and even member school stadiums with almost photographic realism.

12. As discussed in more detail below, Electronic Arts is not permitted to utilize player names and likenesses. In reality, however, Electronic Arts with the knowledge, participation and approval of the NCAA and CLC extensively utilizes actual player names and likenesses. The motivation of Defendants is simple: more money. As the NCAA, CLC and Electronic Arts know, heightened realism in NCAA videogames translates directly into increased sales, and therefore increased revenues for Electronic Arts and increased royalties for the CLC and NCAA

### A. Prohibitions on Use of Names or Likenesses

13. The NCAA does not officially permit the licensing of NCAA athlete likenesses or the use of their names. In fact, NCAA Bylaw 12.5 specifically prohibits the commercial licensing of an NCAA athlete's "name, picture or likeness."

14. Before being allowed to compete each year, all Division I NCAA athletes sign a contract agreeing that they have "read and understand" the NCAA's rules on prohibitions on the commercial use of their name, picture or likeness and affirming that "to the best of [their] knowledge [they] have not violated any amateurism rules."

15. The NCAA has a duty to NCAA athletes to honor its own rules prohibiting the use of student likenesses, to which it requires all athletes to agree. The CLC is likewise contractually obligated to honor NCAA prohibitions on the use of student likenesses. Specifically, the licensing agreements between Electronic Arts and the CLC explicitly prohibit the use of NCAA athlete names and/or likenesses in NCAA branded videogames. Under the NCAA's licensing program, the NCAA and its member institutions, through the CLC, are required to approve every Electronic Arts videogame produced pursuant to the license before its release. Ostensibly NCAA athletes are the intended beneficiaries of the NCAA likeness prohibitions and the contractual provisions that incorporate them in contracts between and among the CLC, NCAA and Electronic Arts.

**B.     Electronic Arts' Blatant Use of Player Names and Likenesses.**

16. Electronic Arts purports to honor the NCAA's rule nominally prohibiting the use of player likenesses. In fact, it does not. As an Electronic Arts spokesperson candidly acknowledged in a 2006 interview with *The Indianapolis Star*, its real mindset with regard to the use of player names and likenesses can be summed up in one sentence: "Ok, how far can we go?"

17. The answer can be found in the games themselves. Electronic Arts seeks to precisely replicate each school's entire team. With rare exception, virtually every real-life Division I football or basketball player in the NCAA has a corresponding player in Electronic Arts' games with the same jersey number, and virtually identical height, weight, build, and home state. In addition, Electronic Arts matches the player's skin tone, hair color, and often even a player's hair style, although this last characteristic can be highly variable over even a single season.

CLASS ACTION COMPLAINT                              - 4 -

010123-11 301644 V3

18. Electronic Arts' misappropriation of player likenesses is not limited to superstars at large schools or top programs. Kent State Golden Flashes running back Eugene Jarvis, for example, stands a mere 5'5" and weighs only 170 pounds. He is also an African-American red-shirt junior from Pennsylvania who wears number 6 for the Golden Flashes. And although he is extremely talented, Mr. Jarvis is unusually small for a college football player. For these reasons, one would expect a randomly generated virtual running back for the Golden Flashes to be somewhat dissimilar to Mr. Jarvis. But here are the first two profile pages for Golden Flashes player No. 6 from the NCAA 2009 Football game:



19. Number 6 for the Golden Flashes is clearly Mr. Jarvis. Both players are 5'5", 170 pound African American players. Both are also red-shirt juniors from Pennsylvania, and both are the starting running back for the Golden Flashes. This is not a mere coincidence.

20. Electronic Arts' blatant misappropriation of player likenesses is highlighted by a comparison of Electronic Arts' NCAA titles to its titles based on professional leagues for which Electronic Arts has the legal right to player likenesses through license agreements with the relevant

010123-11 301644 V3

players' unions.  If Electronic Arts were not utilizing actual player likenesses, one would expect significant changes to the virtual player once the corresponding real player entered a professional league.  In fact, the likeness of NCAA players who later enter a professional league remains virtually identical across titles.

21.     For example, the profile below on the left, taken from the 2008 NCAA football game, shows number 77, an offensive lineman for the Michigan Wolverines. During that period of time, Jake Long wore number 77 for the Wolverines.  On the right is a screenshot of Jake Long from the Madden NFL 2009 football game. The two pictures are virtually identical.

 

22.     The similarities in the two images are not mere coincidence.  Indeed, it would be nearly statistically impossible for randomly generated players to match so closely their real-world counterparts.  Mr. Long and Mr. Jarvis are not unique examples.  They were randomly chosen to show how similar almost all players are to their virtual counterparts.

23.     Misappropriation of basketball players is equally egregious.  For example, Georgetown All-American center Roy Hibbert is 7'2" – unusually tall even for a college basketball player – and weighs 275 pounds.  In the 2007 season, Mr. Hibbert was also an African American, senior, from Maryland who often played with an arm or elbow sleeve.  He also wore jersey number 55 for the Georgetown Hoyas. One would expect a randomly generated "No. 55" for Georgetown to have, at most, a couple of these characteristics.  But here is the profile for Georgetown No. 55.

010123-11 301644 V3





24.     No. 55" in Electronic Arts NCAA 08 March Madness is clearly supposed to be Mr. Hibbert. The two match in every respect. Both have the exact same height and weight. Both are African American players from Maryland. Both are seniors in the 2007 season, and both are the starting center for the Georgetown Hoyas. In fact, both even wear an arm sleeve.

25.     And like football players, the misappropriation of likenesses is not limited to superstars or top programs. For example, Travis Pinick is a guard/forward who wears number 5 for the Yale Bulldogs, a school known more for academics than basketball. Mr. Pinick is 6'7", weighs 210 pounds, and went to high school in California. Unsurprisingly, virtual "No.5" for the Bulldogs is also a guard/forward from California with the exact same height and weight.

26.     In addition to the physical features, Electronic Arts even matches players' idiosyncratic equipment preferences such as wristbands, headbands, facemasks and visors.

27.     For example, in the 2009 NCAA Football game, Texas Tech wide receiver "No. 5" plays with a back plate under his uniform just like the real number 5, Texas Tech All-American wide receiver Michael Crabtree. Additionally, both are 6'3" red-shirt sophomore wide receivers from Texas.

28.     In the same game, Kansas State quarterback "No. 1" plays with an arm sleeve just like the real number 1, Kansas State All-American quarterback Josh Freeman. Mr. Freeman is also a 6'6", 250 pound, junior quarterback from Missouri, just like his virtual twin.

29.     Likewise, Ohio State linebacker "No. 33" plays with thin arm-bands on his upper arm, just below his bicep, wrist wraps and gloves. Interestingly, so does the real number 33, Ohio State All-American, Nagurski Trophy[1] winner, and Butkus Award[2] winner, linebacker James Laurinaitis. Both are also 6'3," 244-pound seniors from Minnesota.

30.     Once again, these are not unique examples. Defendants deliberately and systematically misappropriate players' likenesses to increase revenues and royalties at the expense of student athletes.

31.     In fact, to ensure it matches these unique player equipment preferences as accurately as possible, Electronic Arts sends detailed questionnaires to NCAA team equipment managers to glean precisely the idiosyncratic individual player details.

32.     When players have unique highly identifiable playing behaviors, Electronic Arts attempts to match those as well.

33.     Electronic Arts also matches virtual player's home state to the player's actual home state, and often lists a city close to the player's real hometown as the virtual player's home town.

34.     The only detail that Electronic Arts omits is the real-life player's name on the jersey of his electronic equivalent. As one commentator observed, "the omission of players' names seems little more than a formality, done with a wink and a nudge."

35.     Despite the lack of players' names on jerseys, gamers rarely if ever distinguish between the "real" player and the player in Electronic Arts' videogames. For example, through its

---

[1]    The award given to the top defensive player in the country.

[2]    The award given to the top college linebacker.

010123-11 301644 V3

1 website www.easportsworld.com, Electronic Arts allows gamers to post short video clips from the

2 videogame. Clips that feature unique plays are often labeled with actual player names even though

3 they feature only Electronic Arts' computer generated simulations.

4     36.    The omission of player's names has little consequence because Electronic Arts has

5 intentionally designed its game so that players of the game can easily upload entire rosters of actual

6 player names. Companies such as Gamerosters.com LLC each year release data files that contain

7 the complete rosters for each NCAA Division I school. These rosters can be placed on a flash

8 drive or memory card, and then easily uploaded to the game. Once uploaded, the default jerseys in

9 the game that contain only player numbers are replaced with jerseys that contain both the player's

10 actual name and actual number and in-game announcers then refer to players by their real names.

11 These third parties often correct minor and insignificant mistakes in height or weight thus making

12 Electronic Arts' representations all the more accurate.

13     37.    In the most recent versions of its games for the Sony Play Station 3, Electronic Arts

14 intentionally made the process of obtaining actual player names even easier by allowing players to

15 share rosters online using its "EA Locker" feature. The EA Locker feature allows gamers to

16 upload rosters from other gamers while in the game itself. Prior to the EA Locker, gamers had to

17 download rosters from a computer, upload the files to the gaming console and then transfer the

18 rosters to the game. Now the gamer can obtain full NCAA rosters in a matter of seconds without

19 using a computer. Furthermore, numerous websites, such as www.freencaa09rosters.com, keep a

20 list of players who offer free NCAA rosters utilizing the EA Locker feature.

21     38.    Electronic Arts could easily block users from uploading actual player names and in

22 fact, does block users from uploading certain names, for example, names that contain profanities.

23     39.    Electronic Arts additionally encourages and facilitates the use of players' names and

24 likenesses by allowing gamers to post screen shots – electronic pictures taken from their game –

25 containing players' real names on its website. For example, the following is a screenshot taken

26 directly from www.easportsworld.com that clearly shows the names of three players from the

27 UCLA Bruins. In addition to the names, the virtual players match their real life counterparts in all

28 other material respects:

CLASS ACTION COMPLAINT           - 9 -



## V.   INJURY TO CLASS MEMBERS AND PLAINTIFF

40.     Player names and likenesses and publicity rights are extremely valuable, intangible property.  For example, it has been publicly reported that Electronic Arts paid the NFL Players Union, through their licensing arm, nearly thirty-five million dollars each year for the use of players' names and likenesses.

41.     Despite contractual provisions prohibiting the use of player names and likenesses and in clear violation of the NCAA's own rules, the NCAA, CLC and Electronic Arts have agreed between and among each other, and conspired to permit the use of player names and likenesses in Electronic Arts' videogames for their own monetary gain and without any compensation to the individual athletes.  In furtherance of the conspiracy, Electronic Arts produced these games improperly using player likenesses with the knowledge and consent of the CLC and the NCAA. Specifically, despite their affirmative duties to prevent the utilization of player names and likenesses and in furtherance of the conspiracy, the CLC and the NCAA have intentionally ignored Electronic Arts' blatant use of NCAA athlete names and likenesses and in fact have explicitly approved the utilization of NCAA athlete names and likenesses.

42.     Like virtually every other player, Plaintiff had his name and likeness replicated in several games.

43.     Plaintiff Sam Keller enrolled at Arizona State on a scholarship offer in 2003, as the ninth-ranked quarterback in his class. He played in six games as a true freshman, passing for 247 yards and a touchdown.

44.     In 2004, as a sophomore, Keller played back-up to senior Andrew Walter. He played in only six games, but threw for 606 yards and five touchdowns with only one interception. Keller earned his first career start in the Sun Bowl against Purdue, leading a fourth-quarter comeback victory with 370 yards and three touchdowns. He earned the Sun Bowl Most Valuable Player Award.

45.     As a junior in 2005, Keller played well in his first four games of the season. He had 461 yards against LSU, followed up by 409 yards against Northwestern. He continued with 300-yard performances against USC and Oregon State. In just four games, he passed for 1,582 yards. Unfortunately, he suffered an injury that limited him to only three more starts. Nonetheless, he finished the season with 2,165 yards and 20 touchdowns in just over six full games. To put this into perspective, over his six and one-half games, he averaged over 3 touchdowns per game. This average would be higher than the averages of all quarterbacks playing a full season that year—this includes Matt Leinart, Michael Vick, Brady Quinn, Vince Young, Jay Cutler and Colt Brennan. If he wasn't injured and his performance stayed at this level, he would have likely entered the NFL draft as a highly touted quarterback with almost 40 touchdowns and close to 4000 yards.

46.     In 2006, Keller transferred from Arizona State to the University of Nebraska. Due to NCAA transfer rules, he was forced to sit out his senior season, but redshirted to save his final year of eligibility.

47.     In 2007, as a red-shirt senior, Keller finished the season with 2,422 yards and 14 touchdowns in nine games. Keller also set a Nebraska career and single-season record by completing 63.1 percent of his passes, as well as a record for passing yards per game in a single season and career.

48.     Keller wore number 9 on his jersey at Arizona State. The virtual player who wears number 9 for Arizona State in NCAA Football 2005 has the same height, weight, skin tone, hair color, hair style, handedness, home state, play style (pocket passer), visor preference, and facial

1  features as Sam Keller. Player number 9 is also the starting quarterback for Arizona State and his

2  school year corresponds with Keller's school year.

3      49.    Upon his arrival at Nebraska, Keller wore number 5, which he kept throughout

4  2006. He continued to use number 5 during the spring game in 2007, but later, shortly before

5  playing in his first game at Nebraska in fall 2007, Keller switched to number 9.

6      50.    The 2008 game, however, was researched before Keller made his switch, perhaps as

7  early as 2007 when Keller was a red-shirt senior (not playing for a year), and was too late to catch

8  Keller's abrupt switch to number 9. Although named by year, the game incorporates the team that

9  began playing the preceding year—e.g., the 2007-2008 team would appear in the 2008 game.

10      51.    Virtual player number 5 has the same height, weight, skin tone, home state,

11  handedness, and facial features as Sam Keller. Virtual player number 5 is also the starting

12  quarterback for the University of Nebraska. Remarkably, the virtual player also wears a dark visor,

13  which Keller wore for the first time at Nebraska. But Keller only wore it prior to his first real

14  game, switching at that time to a clear visor. That is, he only wore a dark visor when he was

15  wearing the number 5 jersey.

16      52.    The virtual Nebraska player wearing number 5 a year before Keller played at

17  Nebraska was a senior wide receiver from North Carolina who was African American, 6'1," and

18  195 pounds. This virtual player's description perfectly describes the actual player, Shamus

19  McKoy.

20      53.    It is not coincidental that the virtual number 5 is virtually identical in all material

21  respects to the former Arizona State quarterback who just transferred to Nebraska. Compare the

22  two images and it is obvious they are not randomly generated:

23

24

25

26

27

28









Keller, a graduate of the University of Nebraska with a degree in Political Science, never consented to the use of his name or likeness in any Electronic Arts product.

## VI.    COMMON COURSE OF CONDUCT EMANATING FROM CALIFORNIA AND INDIANA

54.    Electronic Arts is headquartered in Redwood City, California and is therefore a California resident and citizen. As a California resident and citizen, Electronic Arts is subject to California laws. Moreover, the primary executives responsible for negotiating the licensing agreements for NCAA games reside and work in California. Upon information and belief, the administration of licenses and negotiation of contracts with the NCAA and CLC have required frequent contact in Indiana by Electronic Arts, including but not limited to meeting at the NCAA's headquarters in Indiana.

55.    The NCAA has its principal place of business in Indiana and is therefore an Indiana resident and citizen. As an Indiana resident and citizen, the NCAA is subject to Indiana laws. The primary executives responsible for negotiating the licensing agreements for the NCAA games produced by Electronic Arts reside and work in Indiana. Approval to unlawfully utilize player likenesses was granted by NCAA executives located in Indiana. Upon information and belief, the administration of licenses and negotiation of contracts with the NCAA and CLC has required frequent contact with California, including but not limited to meetings at Electronic Arts' headquarters in California regarding player likenesses and frequent reaching out to individuals in the state via interstate wires and the internet.

56.    The CLC has its principal headquarters in Atlanta, Georgia. Its contracts with the NCAA were negotiated in Indiana and are governed by Indiana law. The administration of the contracts, including the provisions regarding player likenesses, requires frequent contact and travel to Indiana. Its contracts with Electronic Arts were negotiated, in whole or in part, with executives located in California and are subject to California law. The administration of the contracts, including the provisions regarding player likenesses, requires frequent contact with California. In negotiating and executing the player likeness provisions of the license with Electronic Arts, the CLC was directed by the NCAA and executives of the NCAA in Indiana.

57. Defendants' unlawful conspiracy took place in California and Indiana. Specifically, the unlawful course of conduct was directed and ratified by Defendants in both California and Indiana.

## VII.  CLASS ACTION ALLEGATIONS

58. Plaintiff sues on his own behalf and on behalf of a class of persons pursuant to Federal Rule of Civil Procedure 23. The putative Class is defined as:

> All NCAA football and basketball players listed on the official opening-day roster of a school whose team was included in any interactive software produced by Electronic Arts, and whose assigned jersey number appears on a virtual player in the software.

59. Excluded from the class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies, class counsel and their employees, and the judicial officers, and associated court staff assigned to this case. Also excluded from the class are the limited number of players whose assigned jersey number appears in the game, but the virtual players' height is not within one inch of the player's roster height and the virtual player's weight is not within 10% of the player's roster weight.

60. The persons in the Class are so numerous that individual joinder of all members is impracticable under the circumstances of this case. Although the precise number of such persons is unknown, the exact size of the Class is easily ascertainable, as each class member can by identified by using Defendants' records. Plaintiff is informed and believes that there are many thousands of Class members.

61.  There are common questions of law and fact specific to the Class that predominate over any questions affecting individual members, including:

 (a)  Whether Electronic Arts utilizes NCAA player likenesses in its videogames;

 (b)  Whether such use is unlawful;

 (c)  Whether NCAA's duty of good faith and fair dealing requires them to protect players' likeness rights when dealing with Electronic Arts,

 (d)  Whether NCAA and the CLC have conspired with Electronic Arts to

CLASS ACTION COMPLAINT                                      - 15 -

010123-11 301644 V3

illegally use players' likenesses,

(e)    Whether Defendants have authorized, approved, or permitted Electronic Arts' use of NCAA player likenesses in its videogames;

(f)    Whether NCAA's conduct violates Indiana Code § 32-36-1-1;

(g)    Whether Electronic Arts' conduct violates California Civil Code § 3344;

(h)    Whether Electronic Arts' conduct constitutes an unfair trade practice;

(i)    Whether class members have been damaged by Defendants' conduct and the amount of such damages;

(j)    Whether treble damages are appropriate and the amount of such damages;

(k)    Whether punitive damages are appropriate and the amount of such damages;

(l)    Whether statutory damages are appropriate and the amount of such damages; and

(m)    Whether Defendants should disgorge their unlawful profits and the amount of such profits.

62.     Plaintiff's claims are typical of the Class' claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Class, and Plaintiff challenges the practices and course of conduct engaged in by Defendant with respect to the Class as a whole.

63.     Plaintiff will fairly and adequately protect the interests of the class. He will vigorously pursue the claims and has no antagonistic conflicts. Plaintiff has retained counsel who are able and experienced class action litigators and are familiar with the videogame industry.

64.     Defendants have acted or refused to act on grounds that apply generally to the class, and final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. A class action is also appropriate because Defendants have acted and refuse to take steps that are, upon information and belief, generally applicable to thousands of individuals, thereby making injunctive relief appropriate with respect to the Class as a whole.

65.     Questions of law or fact common to class members predominate over any questions affecting only individual members. Resolution of this action on a class-wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the

1    context of this litigation no individual class member can justify the commitment of the large

2    financial resources to vigorously prosecute a lawsuit against Defendants.  Separate actions by

3    individual class members would also create a risk of inconsistent or varying judgments, which

4    could establish incompatible standards of conduct for Defendant and substantially impede or

5    impair the ability of class members to pursue their claims.  It is not anticipated that there would be

6    difficulties in managing this case as a class action.

### IX.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Deprivation of Rights of Publicity, Violation of Indiana Code § 32-36-1-1)**
**(As Against NCAA)**

10    66.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully

11    set forth herein.

12    67.    Plaintiff and class members' names, voices, signatures, photographs, images,

13    likenesses, distinctive appearances, gestures, and mannerisms have commercial value.  Pursuant to

14    and in furtherance of its unlawful conspiracy with the NCAA and the CLC, Electronic Arts has

15    used and continues to use Plaintiff's and class members' names, images, likenesses and distinctive

16    appearances without their consent in connection with and for the purposes of advertising, selling

17    and soliciting purchases of its videogames, including its NCAA Football, NCAA Basketball and

18    NCAA March Madness franchises.

19    68.    Defendants have willfully and intentionally used and continued to use Plaintiff's

20    and class members' rights of publicity.

21    69.    Defendants undertook actions in furtherance of their conspiracy within the State of

22    Indiana.  Specifically, Defendant NCAA is located in Indiana and all conduct of the NCAA alleged

23    herein took place or was ratified in Indiana.  In addition, NCAA has hosted meetings in Indiana,

24    contracted in Indiana, and NCAA's decisions and approvals for the use of player names and

25    likenesses arose in and emanated from Indiana.

26    70.    As a result of NCAA's conduct, Plaintiff has been injured.

27

28

CLASS ACTION COMPLAINT                               - 17 -

010123-11 301644 V3

**SECOND CAUSE OF ACTION**
**(Deprivation of Rights of Publicity**
**Violation of California Civil Code § 3344)**
**(As Against Electronic Arts)**

71.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

72.     Electronic Arts has knowingly and intentionally utilized and continue to utilize the names and likenesses of Plaintiff and class members in videogames produced by Electronic Arts without the consent of Plaintiff and class members.  This conduct has occurred in and emanated from California, specifically Electronic Arts' headquarters.

73.     Electronic Arts has used and continues to use Plaintiff's and class members' names and likenesses for the purposes of advertising, selling and soliciting purchases of Electronic Arts' videogames, including its NCAA Football, NCAA Basketball and NCAA March Madness franchises. .  Most decisions and policy relating to this conduct has occurred in and emanated from California, specifically Electronic Arts' headquarters.

74.     As a result of Electronic Arts' misappropriation of their publicity rights, Plaintiff and class members have been injured.

**THIRD CAUSE OF ACTION**
**(Violation of Rights of Publicity**
**California Common Law)**
**(As Against Electronic Arts)**

75.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

76.     Pursuant to their unlawful conspiracy, Electronic Arts has utilized and continues to utilize the names, likenesses and identities of Plaintiff and class members in Electronic Arts' videogames without their consent and for their own commercial advantage.

77.     As a result of Electronic Arts' misappropriation of their publicity rights Plaintiff and class members have been injured.

010123-11 301644 V3

**FOURTH CAUSE OF ACTION**
**(Civil Conspiracy)**
**(As Against All Defendants)**

78.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

79.    On information and belief, Defendants, and each of them, have conspired and combined with each other, and possibly with third parties, to use class members' likenesses without permission, and have achieved a meeting of the minds, through either express or tacit agreement, on an object or course of action of the conspiracy, including depriving class members of their right to protect their names, likenesses and rights to publicity and their contractual, property rights.

80.    Defendants have formed and operated a civil conspiracy with each other, performing as a part of the conspiracy numerous overt acts in furtherance of the common design, including one or more unlawful acts which were performed to accomplish a lawful or unlawful goal, or one or more lawful acts which were performed to accomplish an unlawful goal.

81.    As a result of the conduct of the Defendants and the conspiracy, Plaintiff and class members have been damaged as described above.

**FIFTH CAUSE OF ACTION**
**(Violation of the Unfair Competition Act,**
**California Business & Professions Code § 17200 *et seq.*)**
**(As Against Electronic Arts)**

82.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

83.    Electronic Arts' conduct and unlawful conspiracy, as alleged above, constituted and constitutes unfair, unlawful and fraudulent business practices in violation of Section 17200 *et seq.* of the California Business and Professions Code.  The conduct is unfair, unlawful, and fraudulent because among other things it violates California Civil Code § 3344.

84.    Electronic Arts' conduct has further caused and is causing damage and irreparable injury to Plaintiff and class members.  Plaintiff and class members are accordingly entitled to disgorgement of Electronic Arts' profits and injunctive relief, plus interest and attorneys' fees, pursuant to California Code of Civil Procedure § 1021.5 and request the following injunctive relief:

CLASS ACTION COMPLAINT                                    - 19 -

010123-11 301644 V3

1   (a) that Electronic Arts be ordered to cease and desist from continuing to unlawfully utilize Plaintiff

2   and class members names and likenesses and (b) that Electronic Arts disgorge all its profits obtained

3   from the utilization of Plaintiff and class members names and likenesses.

### SIXTH CAUSE OF ACTION
### (Breach of Contract)
### (As Against NCAA)

6      85.    Defendant NCAA entered into uniform or substantially similar contracts (which are

7   identical in material terms) with class members.

8      86.    These contracts impose specified duties on Defendant NCAA and require it to fulfill

9   certain obligations to class members, including a duty to deal fairly and in good faith with Plaintiff

10   and class members.

11      87.    In furtherance of the unlawful conspiracy alleged above and with the knowledge and

12   consent of the CLC and Electronic Arts, the NCAA breached its contracts with class members by,

13   among other things, (1) seeking to accomplish indirectly through its relationship and agreements

14   with Defendant Electronic Arts that which it could not do directly (profit from class members'

15   likenesses); (2) failing to insure and protect class members' rights of when it established contractual

16   relationships with the other Defendants; (3) permitting the other Defendants to use Plaintiff and

17   class members' likeness – such as when it expressly permitted Electronic Arts to utilize players'

18   names and likenesses; (4) purposely ignoring that the other Defendants were using class members'

19   likenesses, despite the fact that class members only gave Defendant NCAA limited publicity rights

20   and for NCAA events; and (5) not abiding by the terms of its own contracts.

21      88.    As a proximate result of Defendants' conduct, Plaintiff and class members have been

22   injured.

### SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)
### (As Against Electronic Arts and CLC)

25      89.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully

26   set forth herein.

27

28

010123-11 301644 V3

90.     To the detriment of Plaintiff and class members, Defendants Electronic Arts and CLC have been and continue to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein. Electronic Arts and CLC have been unjustly benefited through the sale of videogames that utilize the names and likenesses of Plaintiff and Class Members.

91.     Between Defendants Electronic Arts/CLC and Plaintiff/class members, it would be unjust for Electronic Arts and CLC to retain the benefits attained by their wrongful actions. Accordingly, Plaintiff and class members seek full restitution of Electronic Arts' and CLC's enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

A.      Certification of the action as a Class Action pursuant to the Federal Rules of Civil Procedure, and appointment of Plaintiff as the Class Representative and his counsel of record as Class Counsel;

B.      A declaration by this Court that Defendants' conduct constituted a conspiracy, and that they are each jointly and severally liable for the conduct of or damage inflicted by any other defendant;

C.      Actual damages, statutory damages, punitive damages, and such other relief as provided by the statutes cited herein;

D.      Disgorgement of all profits earned by Defendants from the sale of videogames containing the likenesses of Plaintiff and class members;

E.      Prejudgment and post-judgment interest on such monetary relief;

F.      Equitable relief in enjoining future use of the names or likenesses of Plaintiff and class members in videogames, and declaring null, void and/or unenforceable any contractual provisions or NCAA rules purporting to limit the right of Plaintiff and class members to receive compensation for their injuries;

CLASS ACTION COMPLAINT                                      - 21 -

010123-11 301644 V3

1   G. Seizure and destruction of all copies of any videogames in the possession, custody

2 or control of Defendants or third parties (to the extent permitted by law ) that infringe upon

3 Plaintiff's and class members' rights of publicity;

4   H. The costs of bringing this suit, including reasonable attorneys' fees; and

5   I. All other relief to which Plaintiff and class members may be entitled at law or in

6 equity.

7        **VIII. JURY TRIAL DEMANDED**

8   92. Plaintiff demands a trial by jury on all issues triable of right by jury.

9

10 # # #

11 # # #

RESPECTFULLY SUBMITTED this 5th day of May, 2009.

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____

SHANA E. SCARLETT
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com

Robert B. Carey
Leonard W. Aragon
HAGENS BERMAN SOBOL SHAPIRO LLP
2425 East Camelback Road, Suite 650
Phoenix, Arizona 85016
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rcarey@hbsslaw.com
leonard@hbsslaw.com

Stuart M. Paynter (226147)
THE PAYNTER LAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C. 20005
Telephone: (202) 626-4486
Facsimile: (866) 734-0622
stuart@smplegal.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Attorneys for Plaintiff