KEKER & VAN NEST LLP
ROBERT A. VAN NEST - #84065
R. JAMES SLAUGHTER - #192813
STEVEN A. HIRSCH - #171825
R. ADAM LAURIDSEN - #243780
rvannest@kvn.com
rslaughter@kvn.com
shirsch@kvn.com
alauridsen@kvn.com
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

Attorneys for Defendant
ELECTRONIC ARTS INC.

**FILED**

FEB 1 8 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

Fee Paid
TNR
given

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re NCAA Student-Athlete Name & Likeness Licensing Litigation | Case No. CV-09-1967 (CW) |
| | *(Consolidated w/Case Nos. C-09-03329-CW; C-09-04128-CW; C-09-04882-CW; C-09-05100-CW; C-09-05134-CW; C-09-05372-CW; and C-09-05378-CW)* |
| | **ELECTRONIC ARTS INC.'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT** |

1

468510.01

1   Electronic Arts Inc. ("EA"), a defendant herein, appeals to the United States Court of

2   Appeals for the Ninth Circuit from the district court's "Order on Defendants' Motions to Dismiss

3   (Docket Nos. 34, 47, 48) and Electronic Arts' Anti-SLAPP Motion to Strike (Docket No. 35),"

4   entered in this case on February 8, 2010 (Docket No. 150) ("the Order"), insofar as the Order

5   denied EA's "Special Motion to Strike Pursuant to Cal. Code Civ. Proc. § 425.16 (Anti-SLAPP)"

6   (Docket No. 35).  A copy of the Order is attached hereto as Exhibit A.

Respectfully submitted,

7

8   Dated:  February 18, 2010                    KEKER & VAN NEST LLP

9

10

By: _____

11                                              R. JAMES SLAUGHTER
                                               Attorneys for Defendant
12                                              ELECTRONIC ARTS INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

468510.01

**EXHIBIT A**

United States District Court
For the Northern District of California

1

2            IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5                                              No. C 09-1967 CW

SAMUEL MICHAEL KELLER, on behalf of
6   himself and all others similarly            ORDER ON DEFENDANTS'
    situated,                                   MOTIONS TO DISMISS
7                                               (Docket Nos. 34, 47,
              Plaintiff,                        48) AND ELECTRONIC
8                                               ARTS' ANTI-SLAPP
      v.                                        MOTION TO STRIKE
9                                               (Docket No. 35)
ELECTRONIC ARTS, INC.; NATIONAL
10  COLLEGIATE ATHLETICS ASSOCIATION; and
    COLLEGIATE LICENSING COMPANY,
11
              Defendants.
12  _____/

13         Defendants Electronic Arts, Inc. (EA), the National Collegiate

14   Athletics Association (NCAA) and the Collegiate Licensing Company

15   (CLC) move separately to dismiss Plaintiff Samuel Michael Keller's

16   claims against them.  EA also moves to strike Plaintiff's claims

17   against it pursuant to California Civil Code section 425.16 (Docket

18   No. 35).  Plaintiff opposes the motions.  As amici curiae, James

19   "Jim" Brown and Herbert Anthony Adderley filed a brief in

20   opposition to EA's motion to dismiss.  The motions were heard on

21   December 17, 2009.  Having considered all of the papers submitted

22   by the parties, the Court DENIES EA's Motion to Dismiss (Docket No.

23   34), GRANTS NCAA's Motion in part and DENIES it in part (Docket No.

24   48), DENIES CLC's Motion (Docket No. 47) and DENIES EA's Motion to

25   Strike (Docket No. 35).

26                            BACKGROUND

27        Plaintiff is a former starting quarterback for the Arizona

28

United States District Court
For the Northern District of California

1  State University and University of Nebraska football teams.

2      EA, a Delaware corporation with a principal place of business

3  in California, develops interactive entertainment software.   It

4  produces, among other things, the "NCAA Football" series of video

5  games.   In the games, consumers can simulate football matches

6  between college and university teams.   Plaintiff alleges that, to

7  make the games realistic, EA designs the virtual football players

8  to resemble real-life college football athletes, including himself.

9  He claims that these virtual players are nearly identical to their

10 real-life counterparts: they share the same jersey numbers, have

11 similar physical characteristics and come from the same home state.

12 To enhance the accuracy of the player depictions, Plaintiff

13 alleges, EA sends questionnaires to team equipment managers of

14 college football teams.   Although EA omits the real-life athletes'

15 names from "NCAA Football," Plaintiff asserts that consumers may

16 access online services to download team rosters and the athletes'

17 names, and upload them into the games.   Plaintiff claims that, in

18 recent iterations, EA has included features that facilitate the

19 upload of this information.

20     Plaintiff alleges that EA uses his likeness without his

21 consent.   He asserts that NCAA, an unincorporated association based

22 in Indiana, and CLC, a Georgia corporation headquartered in

23 Atlanta, facilitated this use.   Plaintiff claims that EA, NCAA and

24 CLC met at NCAA's Indiana headquarters and EA's California

25 headquarters to negotiate the agreements that underlie the alleged

26 misconduct.

27     Plaintiff alleges other misconduct by NCAA and CLC, related to

28 NCAA's amateurism rules.   Plaintiff maintains that NCAA's approval

2

1  of EA's games violates NCAA's "duty to NCAA athletes to honor its

2  own rules prohibiting the use of student likenesses . . . ."

3  Compl. ¶ 15.  He cites NCAA Bylaw 12.5, which prohibits the

4  commercial licensing of the "name, picture or likeness" of athletes

5  at NCAA-member institutions.  Compl. ¶ 13.  Plaintiff asserts that

6  CLC must honor NCAA's prohibitions on the use of student

7  likenesses.

8      Plaintiff charges NCAA with violations of Indiana's right of

9  publicity statute, civil conspiracy and breach of contract.  He

10  charges CLC with civil conspiracy and unjust enrichment.  Against

11  EA, he pleads claims for violations of California's statutory and

12  common law rights of publicity, civil conspiracy, violation of

13  California's Unfair Competition Law and unjust enrichment.  He

14  intends to move to certify his case as a class action and seeks,

15  among other things, damages and an injunction prohibiting the

16  future use of his and putative class members' likenesses.

17                          LEGAL STANDARD

18      A complaint must contain a "short and plain statement of the

19  claim showing that the pleader is entitled to relief."  Fed. R.

20  Civ. P. 8(a).  Dismissal under Rule 12(b)(6) for failure to state a

21  claim is appropriate only when the complaint does not give the

22  defendant fair notice of a legally cognizable claim and the grounds

23  on which it rests.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555

24  (2007).  In considering whether the complaint is sufficient to

25  state a claim, the court will take all material allegations as true

26  and construe them in the light most favorable to the plaintiff.  NL

27  Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986).

28  However, this principle is inapplicable to legal conclusions;

United States District Court
For the Northern District of California

3

United States District Court
For the Northern District of California

1  "threadbare recitals of the elements of a cause of action,

2  supported by mere conclusory statements," are not taken as true.

3  Ashcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937, 1949-50 (2009)

4  (citing Twombly, 550 U.S. at 555).

5                              DISCUSSION

6  I.  Indiana Right of Publicity Claim

7       Plaintiff alleges that NCAA violated his Indiana right of

8  publicity.  He argues that Indiana law applies to NCAA because its

9  headquarters are located in Indiana and the alleged violation

10 occurred in Indiana.  NCAA argues that Plaintiff's claim fails as a

11 matter of law because he does not allege that it used his image or

12 likeness.  Plaintiff responds that NCAA used his likeness because

13 it "expressly reviewed and knowingly approved each version of each

14 NCAA-brand videogame . . . ."  Opp'n to NCAA's Mot. to Dismiss at

15 4.

16      Under Indiana law, personalities have a property interest in,

17 among other things, their images and likenesses.  Ind. Code § 32-

18 36-1-7.  A personality is a living or deceased person whose image

19 and likeness have commercial value.  Id. § 32-36-1-6.  Indiana Code

20 section 32-36-1-8 provides,

21            A person may not use an aspect of a
              personality's right of publicity for a
22            commercial purpose during the personality's
              lifetime or for one hundred (100) years after
23            the date of the personality's death without
              having obtained previous written consent from a
24            person . . . .

25 (emphasis added).

26      Although the parties do not offer controlling authority on

27 this point, the plain language of the statute favors NCAA's

28 position.  Plaintiff argues that NCAA's liability under Indiana law

                                  4

1   arises from its knowing approval of EA's use of his likeness.   This

2   interpretation expands liability under the Indiana statute to

3   include persons who enable right of publicity violations.   However,

4   Plaintiff does not offer any authority to show that section 32-36-

5   1-8 encompasses this type of misconduct.   The Court declines to

6   adopt Plaintiff's interpretation.

7        Plaintiff makes a related argument that NCAA should be held

8   liable under Indiana's right of publicity statute as a co-

9   conspirator of EA, which used his likeness.   He cites cases that

10  provide that co-conspirators can be held liable as joint

11  tortfeasors for damages caused by another co-conspirator.   <u>See,</u>

12  <u>e.g.</u>, <u>Applied Equip. Corp. v. Litton Saudi Arabia Ltd.</u>, 7 Cal. 4th

13  503, 511 (1994); <u>Boyle v. Anderson Fire Fighters Ass'n Local 1262</u>,

14  497 N.E.2d 1073, 1079 (Ind. Ct. App. 1986).   However, these cases

15  are inapposite because Plaintiff has not alleged that either EA or

16  CLC, NCAA's alleged co-conspirators, violated Indiana's right of

17  publicity statute.

18       Plaintiff's Indiana right of publicity claim against NCAA is

19  dismissed with leave to amend to allege that NCAA used his likeness

20  or conspired with others to violate his right of publicity under

21  Indiana law.

22  II.   California Right of Publicity Claims

23       California's right of publicity statute provides,

24            Any person who knowingly uses another's name,
             voice, signature, photograph, or likeness, in
25            any manner, on or in products, merchandise, or
             goods, or for purposes of advertising or
26            selling, or soliciting purchases of, products,
             merchandise, goods or services, without such
27            person's prior consent . . . shall be liable
             for any damages sustained by the person or
28            persons injured as a result thereof.

5

United States District Court
For the Northern District of California

1  Cal. Civ. Code § 3344(a).  The statutory right of publicity

2  complements the common law right of publicity, which arises from

3  the misappropriation tort derived from the law of privacy.  <u>See</u>

4  <u>Comedy III Prods., Inc. v. Saderup</u>, 25 Cal. 4th 387, 391 (2001).

5  To state a claim under California common law, a plaintiff must

6  allege "'(1) the defendant's use of the plaintiff's identity;

7  (2) the appropriation of plaintiff's name or likeness to

8  defendant's advantage, commercially or otherwise; (3) lack of

9  consent; and (4) resulting injury.'"  <u>Hilton v. Hallmark Cards</u>, 580

10  F.3d 874, 889 (9th Cir. 2009) (quoting <u>Downing v. Abercrombie &</u>

11  <u>Fitch</u>, 265 F.3d 994, 1001 (9th Cir. 2001)).  Although the statutory

12  and common law rights are similar, there are differences.  For

13  example, to state a claim under section 3344, a plaintiff must

14  prove knowing use in addition to satisfying the elements of a

15  common law claim.  <u>Kirby v. Sega of Am., Inc.</u>, 144 Cal. App. 4th

16  47, 55 (2006).

17       EA does not contest the sufficiency of Plaintiff's claims.  It

18  asserts, however, that his right of publicity claims are barred by

19  the First Amendment and California law.  The Court considers and

20  rejects each of these defenses in turn.

21       A.   Transformative Use Defense[1]

22       A defendant may raise an affirmative defense that the

23  challenged work is "protected by the First Amendment inasmuch as it

24  contains significant transformative elements or that the value of

25

26  ─────────────────

27       [1] <u>Amici</u> invite the Court to adopt another standard to assess
   right of publicity claims.  Because the Court finds that the
28  transformative test is sufficient for the purposes of this motion,
   it does not address <u>amici</u>'s arguments.

United States District Court
For the Northern District of California

1 the work does not derive primarily from the celebrity's fame."

2 Hilton, 580 F.3d at 889 (quoting Comedy III, 25 Cal. 4th at 407)

3 (internal quotation marks omitted). The defense "poses what is

4 essentially a balancing test between the First Amendment and the

5 right of publicity." Hilton, 580 F.3d at 889 (quoting Winter v. DC

6 Comics, 30 Cal. 4th 881, 885 (2003)) (internal quotation marks

7 omitted).

8     To determine whether a work is transformative, a court must

9 inquire into

10            whether the celebrity likeness is one of the
           "raw materials" from which an original work is

11            synthesized, or whether the depiction or
           imitation of the celebrity is the very sum and

12            substance of the work in question. We ask, in
           other words, whether a product containing a

13            celebrity's likeness is so transformed that it
           has become primarily the defendant's own

14            expression rather than the celebrity's
           likeness. And when we use the word

15            "expression," we mean expression of something
           other than the likeness of the celebrity.

16

Comedy III, 25 Cal. 4th at 406. "An artist depicting a celebrity

17 must contribute something more than a merely trivial variation, but

18 create something recognizably his own, in order to qualify for

19 legal protection." Winter, 30 Cal. 4th at 888 (quoting Comedy III,

20 25 Cal. 4th at 408) (internal quotation and editing marks omitted).

21 The analysis "simply requires the court to examine and compare the

22 allegedly expressive work with the images of the plaintiff to

23 discern if the defendant's work contributes significantly

24 distinctive and expressive content." Kirby, 144 Cal. App. 4th at

25 61. "If distinctions exist, the First Amendment bars claims based

26 on appropriation of the plaintiff's identity or likeness; if not,

27 the claims are not barred." Id.

28

1    Two California Supreme Court cases "bookend the spectrum" used

2 to measure a work's transformative nature. Hilton, 580 F.3d at

3 890-91. On one end, Comedy III provides an example of a non-

4 transformative work. There, the defendant's "literal, conventional

5 depictions of The Three Stooges," drawn in charcoal and printed on

6 tee-shirts, did not contain transformative elements that warranted

7 protection by the First Amendment. Comedy III, 25 Cal. 4th at 409.

8 Interpreting Comedy III, the Ninth Circuit stated that "it is clear

9 that merely merchandising a celebrity's image without that person's

10 consent . . . does not amount to a transformative use." Hilton,

11 580 F.3d at 890.

12    Winter offers the opposite bookend. There, a comic book

13 publisher depicted two musicians, Johnny and Edgar Winter, as half-

14 human, half-worm cartoon characters. Winter, 30 Cal. 4th at 890.

15 The court affirmed summary judgment in favor of the defendant,

16 holding that the images were sufficiently transformative. The

17 court stated,

18         Although the fictional characters Johnny and
          Edgar Autumn are less-than-subtle evocations of
19         Johnny and Edgar Winter, the books do not
          depict plaintiffs literally. Instead,
20         plaintiffs are merely part of the raw materials
          from which the comic books were synthesized.

21
     Id.
22
       Using Comedy III and Winter as guideposts, Kirby applied the
23
   transformative use analysis to a video game. There, the court held
24
   that the main character in the defendant's video game was
25
   transformed. The plaintiff was a musician and dancer, known for
26
   saying the phrase "ooh la la." Kirby, 144 Cal. App. 4th at 50-51.
27
   Ulala, the main character in the defendant's game, worked as a news
28

United States District Court
For the Northern District of California

8

United States District Court
For the Northern District of California

1   reporter in the twenty-fifth century, "dispatched to investigate an

2   invasion of Earth." _Id._ at 52. Although there were similarities

3   between the two, the court held Ulala to be "more than a mere

4   likeness or literal depiction of Kirby." _Id._ at 59. "Ulala

5   contains sufficient expressive content to constitute a

6   'transformative work' under the test articulated by the

7   [California] Supreme Court." _Id._ In particular, Ulala was

8   extremely tall and wore clothing that differed from the plaintiff's

9   and the setting for the game was unlike any in which she had

10  appeared. _Id._

11      Here, EA's depiction of Plaintiff in "NCAA Football" is not

12  sufficiently transformative to bar his California right of

13  publicity claims as a matter of law.[2] In the game, the quarterback

14  for Arizona State University shares many of Plaintiff's

15

16      [2] EA asks the Court to take judicial notice of the content of
    the video games "NCAA Football 2006" through "NCAA Football 2009,"
17  "NCAA March Madness 2006" through "NCAA March Madness 2008," and
    "NCAA Basketball 2009;" paragraphs four of the Strauser and O'Brien
18  Declarations summarizing the content of these video games; various
    press releases announcing the release date of the video games; a
19  United States Copyright Office document indicating the date of
    first publication for "NCAA March Madness 2007;" an August 15, 2008
20  order from <u>Kent v. Universal Studios, Inc.</u>, Case No. 08-2704 (C.D.
    Cal.); and the content of the CBSSports.com Fantasy College
21  Football game. (Docket No. 36.) Generally, in ruling on a motion
    to dismiss, a court cannot consider material outside of the
22  complaint. <u>Branch v. Tunnell</u>, 14 F.3d 449, 453 (9th Cir. 1994),
    <u>overruled on other grounds in</u> <u>Galbraith v. County of Santa Clara</u>,
23  307 F.3d 1119, 1127 (9th Cir. 2002). However, a court may consider
    exhibits submitted with the complaint and those documents "whose
24  contents are alleged in a complaint and whose authenticity no party
    questions, but which are not physically attached to the pleading."
25  _Id._ at 453-54.
        Because Plaintiff refers to the video games in his complaint,
26  the Court GRANTS EA's request for judicial notice of them.
    Plaintiff does not mention the press releases or other materials
27  proffered by EA. Therefore, the Court DENIES EA's request as to
    the other materials.

28

United States District Court
For the Northern District of California

1 | characteristics.  For example, the virtual player wears the same
2 | jersey number, is the same height and weight and hails from the
3 | same state.  EA's depiction of Plaintiff is far from the
4 | transmogrification of the Winter brothers.  EA does not depict
5 | Plaintiff in a different form; he is represented as he what he was:
6 | the starting quarterback for Arizona State University.  Further,
7 | unlike in <u>Kirby</u>, the game's setting is identical to where the
8 | public found Plaintiff during his collegiate career: on the
9 | football field.

10 |     EA asserts that the video game, taken as a whole, contains
11 | transformative elements.  However, the broad view EA asks the Court
12 | to take is not supported by precedent.  In <u>Winter</u>, the court
13 | focused on the depictions of the plaintiffs, not the content of the
14 | other portions of the comic book.  The court in <u>Kirby</u> did the same:
15 | it compared Ulala with the plaintiff; its analysis did not extend
16 | beyond the game's elements unrelated to Ulala.  These cases show
17 | that this Court's focus must be on the depiction of Plaintiff in
18 | "NCAA Football," not the game's other elements.

19 |     Accordingly, at this stage, EA's transformative use defense
20 | fails.

21 |     B.   Public Interest Defense

22 |     "Under California law, 'no cause of action will lie for the
23 | publication of matters in the public interest, which rests on the
24 | right of the public to know and the freedom of the press to tell
25 | it.'"  <u>Hilton</u>, 580 F.3d at 892 (quoting <u>Montana v. San Jose Mercury</u>
26 | <u>News, Inc.</u>, 34 Cal. App. 4th 790, 793 (1995)).  "'Public interest
27 | attaches to people who by their accomplishments or mode of living
28 | create a bona fide attention to their activities.'"  <u>Hilton</u>, 580

1 F.3d at 892 (quoting <u>Dora v. Frontline Video, Inc.</u>, 15 Cal. App.

2 4th 536, 542 (1993)).

3      In <u>Gionfriddo v. Major League Baseball</u>, the court held that

4 the defendants were entitled to the public interest defense.   94

5 Cal. App. 4th 400, 415 (2001).   There, the plaintiffs, four former

6 baseball players, claimed that the defendants' use of their names

7 and statistics violated their rights of publicity.   <u>Id.</u> at 405-07.

8 Their information appeared on a website, which reported historical

9 team rosters and listed names of players who won awards during each

10 season.   <u>Id.</u> at 406.   The defendants also included still

11 photographs of the plaintiffs from their playing days in video

12 documentaries.   <u>Id.</u>   The court characterized these uses as "simply

13 making historical facts available to the public through game

14 programs, Web sites and video clips."   <u>Id.</u> at 411.   Because the

15 public had an interest in the plaintiffs' athletic performance, the

16 First Amendment protected the "recitation and discussion of [their]

17 factual data."   <u>Id.</u>

18      The public interest defense also applied in <u>Montana</u>.   There,

19 the defendant newspaper sold posters containing reproductions of

20 newspaper pages reporting on the San Francisco 49ers' win in the

21 1990 Super Bowl; these pages contained images of the plaintiff.   34

22 Cal. App. 4th at 792.   The plaintiff conceded that the original

23 newspaper accounts were protected by the First Amendment, but

24 challenged their reproduction as posters.   <u>Id.</u> at 794.   The court

25 held that the posters were entitled to the same First Amendment

26 protection as the original news stories.   The court stated,

27          Montana's name and likeness appeared in the posters
            for <u>precisely</u> the same reason they appeared on the
28          original newspaper front pages: because Montana was

11

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> a major player in contemporaneous newsworthy sports
> events.  Under these circumstances, Montana's claim
> that SJMN used his face and name solely to extract
> the commercial value from them fails.

Id.  (emphasis in original).  Citing Montana, the Ninth Circuit

stated that the public interest defense "is about . . . publication

or reporting."  Hilton, 580 F.3d at 892.

"NCAA Football" is unlike the works in Gionfriddo and Montana.

The game does not merely report or publish Plaintiff's statistics

and abilities.  On the contrary, EA enables the consumer to assume

the identity of various student athletes and compete in simulated

college football matches.  EA is correct that products created for

entertainment deserve constitutional protection.  See, e.g.,

Gionfriddo, 94 Cal. App. 4th at 410 ("Entertainment features

receive the same constitutional protection as factual news

reports.").  But it does not follow that these protections are

absolute and always trump the right of publicity.

EA cites cases in which courts held that the public interest

exception protected online fantasy baseball and football games.

Although these games are more analogous to "NCAA Football," the

cases are nonetheless distinguishable.  In C.B.C. Distribution and

Marketing v. Major League Baseball Advanced Media, a declaratory

judgment action, the plaintiff sold "fantasy baseball products"

that included the names and statistics of major league baseball

players.  505 F.3d 818, 820-21 (8th Cir. 2007).  Through these

products, consumers could form fantasy baseball teams and compete

with other users.  Id. at 820.  "A participant's success . . .

depend[ed] on the actual performance of the fantasy team's players

on their respective actual teams during the course of the major

United States District Court
For the Northern District of California

1 league baseball season." Id. at 820-21. The defendant

2 counterclaimed, arguing that these products violated players'

3 rights of publicity. The court disagreed. It analogized the case

4 to Gionfriddo, and held that the use of the players' information in

5 the fantasy game was a "'recitation and discussion'" of the

6 players' information. Id. at 823-24 (quoting Gionfriddo, 94 Cal.

7 App. 4th at 411).

8      C.B.C. Distribution is inapplicable here. Success in "NCAA

9 Football" does not depend on updated reports of the real-life

10 players' progress during the college football season. Further,

11 EA's game provides more than just the players' names and

12 statistics; it offers a depiction of the student athletes' physical

13 characteristics and, as noted, enables consumers to control the

14 virtual players on a simulated football field. EA's use of

15 Plaintiff's likeness goes far beyond what the court considered in

16 C.B.C. Distribution.

17      EA is not entitled to the public interest defense on this

18 motion.

19      C.    Section 3344(d) Exemption

20      California Civil Code section 3344(d) provides a public

21 affairs exemption to the statutory right of publicity. It exempts

22 from liability under section 3344 "a use of a name . . . or

23 likeness in connection with any news, public affairs, or sports

24 broadcast or account, or any political campaign." Cal. Civ. Code

25 § 3344(d). This exemption is not coextensive with the public

26 interest defense; it "is designed to avoid First Amendment

27 questions in the area of misappropriation by providing extra

28 breathing space for the use of a person's name in connection with

1  matters of public interest." <u>New Kids on the Block v. News Am.</u>

2  <u>Pub., Inc.</u>, 971 F.2d 302, 310 n.10 (9th Cir. 1992) (citing <u>Eastwood</u>

3  <u>v. Superior Court</u>, 149 Cal. App. 3d 409, 421 (1983)).

4      In <u>Dora v. Frontline Video, Inc.</u>, a California court held that

5  section 3344(d) barred a plaintiff's statutory right of publicity

6  claim.  15 Cal. App. 4th at 546.  The defendant's documentary on

7  surfing contained, among other things, the plaintiff's name and

8  likeness.  <u>Id.</u> at 540.  The court held that this use was exempted

9  by section 3344(d) because the plaintiff's name and likeness were

10  used in connection with public affairs.  In doing so, the court

11  addressed the meaning of "public affairs."  The court distinguished

12  "public affairs" from "news," stating that "'public affairs' was

13  intended to mean something less important than news."  <u>Dora</u>, 15

14  Cal. App. 4th at 545.  Thus, the subject matter encompassed by

15  public affairs is not limited "to topics that might be covered on

16  public television or public radio."  <u>Id.</u> at 546.

17      Here, Plaintiff does not dispute EA's contention that college

18  athletics are "public affairs."  He asserts, however, that

19  section 3344(d) only applies to factual reporting.[3]  In essence, he

20  asserts that section 3344(d) applies to the same type of

21  "reporting" as does the public interest defense.

22      Neither party offered direct authority on the type of use for

23  which the section 3344(d) exemption applies.  However, <u>Montana</u> is

24

25  [3] EA understands Plaintiff to argue that reporting implicates
    newsworthy information.  So interpreted, EA claims, Plaintiff's
    argument must fail because <u>Dora</u> draws a distinction between "news"
26  and "public affairs."  The Court does not construe Plaintiff's
    argument in the same way.  Instead, the Court reads Plaintiff to
27  argue that "NCAA Football" does not constitute "reporting" and, as
    a result, EA does not use his name and likeness in a manner that is
28  exempted by section 3344(d).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  instructive.  There, the court stated that "the statutory cause of

2  action specifically exempts from liability the use of a name or

3  likeness in connection with the <u>reporting</u> of a matter in the public

4  interest."  34 Cal. App. 4th at 793 (emphasis added).  Thus,

5  without authority requiring otherwise, the Court construes

6  section 3344(d) to require the same type of activity as the public

7  interest defense discussed above, namely reporting.[4]  Although

8  "NCAA Football" is based on subject matter considered "public

9  affairs," EA is not entitled to the statutory defense because its

10 use of Plaintiff's image and likeness extends beyond reporting

11 information about him.

12     Accordingly, Plaintiff's California statutory and common law

13 right of publicity claims are not barred as a matter of law.

14 III. Civil Conspiracy Claims

15     Defendants move separately to dismiss Plaintiff's civil

16 conspiracy claims.  All challenge the sufficiency of Plaintiff's

17 claims, arguing that he does not plead an underlying tort, which is

18 a necessary element.  CLC separately asserts the agent immunity

19 defense.

20     Plaintiff did not specify the state law under which his civil

21 conspiracy claims arise.  For the purposes of this motion, the

22 Court assumes that his claims arise under California law.

23     A.   Sufficiency of the Claims

24     Civil conspiracy "is not a cause of action, but a legal

25

26     [4] Although section 3344(d) and the public interest defense
   implicate the same type of activity, they are nonetheless not
27 coextensive because section 3344(d) defines safe harbors for
   reporting in particular contexts.  <u>See</u> <u>New Kids on the Block</u>, 971
28 F.2d at 310 n.10.

1   doctrine that imposes liability on persons who, although not

2   actually committing a tort themselves, share with the immediate

3   tortfeasors a common plan or design in its perpetration." Applied

4   Equipment Corp., 7 Cal. 4th at 510 (citing Wyatt v. Union Mortgage

5   Co., 24 Cal. 3d 773, 784 (1979)). "Standing alone, a conspiracy

6   does no harm and engenders no tort liability.  It must be activated

7   by the commission of an actual tort." Applied Equipment Corp., 7

8   Cal. 4th at 511.

9       A claim for civil conspiracy consists of three elements:

10  "(1) the formation and operation of the conspiracy, (2) wrongful

11  conduct in furtherance of the conspiracy, and (3) damages arising

12  from the wrongful conduct." Kidron v. Movie Acquisition Corp., 40

13  Cal. App. 4th 1571, 1581 (1995). "The conspiring defendants must

14  . . . have actual knowledge that a tort is planned and concur in

15  the tortious scheme with knowledge of its unlawful purpose." Id.

16  at 1582 (citing Wyatt, 24 Cal. 3d at 784-86).  This knowledge must

17  be combined with an intent to aid in achieving the objective of the

18  conspiracy. Kidron, 40 Cal. App. 4th at 1582; Schick v. Bach, 193

19  Cal. App. 3d 1321, 1328 (1987).  A claim of unlawful conspiracy

20  must contain "enough fact to raise a reasonable expectation that

21  discovery will reveal evidence of illegal agreement." Twombly, 550

22  U.S. at 556.  A bare allegation that a conspiracy existed does not

23  suffice. Id.

24      Plaintiff alleges that there were meetings among Defendants in

25  California and Indiana.  Compl. ¶¶ 54-56.  He asserts that

26  Defendants knew of NCAA principles barring the licensing of

27  student-athlete identities, but nonetheless approved EA's games

28  containing the athletes' likenesses without their consent.  Compl.

United States District Court
For the Northern District of California

16

United States District Court
For the Northern District of California

1 ¶¶ 12-15.  Finally, he claims that EA's actions violated his

2 California statutory and common law rights of publicity.[5]  These

3 factual allegations sufficiently support liability under

4 Plaintiff's civil conspiracy claim.[6]

5      B.   CLC's Agent Immunity Defense

6      CLC maintains that the agent immunity defense bars Plaintiff's

7 conspiracy claim against it.  This defense provides that no

8 liability shall lie "if the alleged conspirator, though a

9 participant in the agreement underlying the injury, was not

10 personally bound by the duty violated by the wrongdoing and was

11 acting only as the agent or employee of the party who did have that

12 duty."  Doctors' Co. v. Superior Court, 49 Cal. 3d 39, 44 (1989).

13      CLC maintains that Plaintiff's allegations that its role as a

14 licensing company entering into agreements on behalf of NCAA

15 establishes, as a matter of law, that it is NCAA's agent.  These

16 allegations are not sufficient at this early stage to establish

17 CLC's entitlement to this defense.

18

19      [5] Plaintiff alleges that Defendants conspired to deprive
"class members of their right to protect their names, likenesses
20 and rights to publicity and their contractual, property rights."
Compl. ¶ 80.  For the purposes of this motion, the Court construes
21 this allegation to refer to EA's alleged violation of Plaintiff's
California right of publicity because he does not state a claim
22 based on the tortious conduct of any other Defendant.

23      [6] Citing Everest Investors 8 v. Whitehall Real Estate Limited
Partnership XI, 100 Cal. App. 4th 1102 (2002), CLC also argues that
24 it cannot accrue tort liability under a civil conspiracy theory
because Plaintiff has not alleged that it can make video games.
25 This argument is unavailing.  Everest Investors 8 states that "tort
liability from a conspiracy presupposes that the conspirator is
26 legally capable of committing the tort -- that he owes a duty to
the plaintiff recognized by law and is potentially subject to
27 liability for the breach of that duty."  Id. at 1106.  Nothing in
the record indicates that CLC is legally incapable of violating
28 Plaintiff's rights of publicity.

17

United States District Court
For the Northern District of California

IV.   Section 17200 Claim

EA maintains that Plaintiff fails to state a claim under California Business and Professions Code section 17200 because he does not allege an underlying wrong or seek available relief. However, as discussed above, Plaintiff sufficiently asserts right of publicity and civil conspiracy claims. With regard to relief, he seeks an injunction, which EA concedes is available under section 17200. Thus, Plaintiff has stated a section 17200 claim against EA.

V.   Breach of Contract Claim

NCAA argues that Plaintiff does not state a breach of contract claim because he has not identified an enforceable contract. Because Plaintiff does not specify the state law under which his claim arises, the Court assumes that California law applies.

To assert a cause of action for breach of contract in California, a plaintiff must plead: (1) existence of a contract; (2) the plaintiff's performance or excuse for non-performance; (3) the defendant's breach; and (4) damages to the plaintiff as a result of the breach. Armstrong Petrol. Corp. v. Tri-Valley Oil & Gas Co., 116 Cal. App. 4th 1375, 1391 n.6 (2004).

Plaintiff has not identified a contract that he is seeking to enforce. Although he refers to an NCAA document as a contract, he does not attach the document to his complaint. Instead, he states that by signing the document, the athletes agree that "they have 'read and understand' the NCAA's rules" and that "to the best of [their] knowledge [they] have not violated any amateurism rules." Compl. ¶ 14. These phrases, on their own, do not indicate that the document is a contract. Plaintiff's breach of contract claim

18

1 against NCAA is dismissed with leave to amend to allege or attach

2 an enforceable contract.

3 VI.  Unjust Enrichment Claims

4      Plaintiff claims that EA and CLC were unjustly enriched

5 through the sale of video games that use his likeness.  EA and CLC

6 argue that his claim is barred because California law does not

7 provide a cause of action for unjust enrichment.  Even if it did,

8 EA and CLC argue, Plaintiff's allegations regarding the existence

9 of a contract with NCAA would independently bar an unjust

10 enrichment claim.

11      California courts appear to be split on whether there is an

12 independent cause of action for unjust enrichment.  Baggett v.

13 Hewlett-Packard Co., 582 F. Supp. 2d 1261, 1270-71 (C.D. Cal. 2007)

14 (applying California law).  One view is that unjust enrichment is

15 not a cause of action, or even a remedy, but rather a general

16 principle, underlying various legal doctrines and remedies.

17 McBride v. Boughton, 123 Cal. App. 4th 379, 387 (2004).  In

18 McBride, the court construed a "purported" unjust enrichment claim

19 as a cause of action seeking restitution.  Id.  There are at least

20 two potential bases for a cause of action seeking restitution:

21 (1) an alternative to breach of contract damages when the parties

22 had a contract which was procured by fraud or is unenforceable for

23 some reason; and (2) where the defendant obtained a benefit from

24 the plaintiff by fraud, duress, conversion, or similar conduct and

25 the plaintiff chooses not to sue in tort but to seek restitution on

26 a quasi-contract theory.  Id. at 388.  In the latter case, the law

27 implies a contract, or quasi-contract, without regard to the

28 parties' intent, to avoid unjust enrichment.  Id.

United States District Court
For the Northern District of California

19

United States District Court
For the Northern District of California

1   Another view is that a cause of action for unjust enrichment

2   exists and its elements are receipt of a benefit and unjust

3   retention of the benefit at the expense of another.  Lectrodryer v.

4   SeoulBank, 77 Cal. App. 4th 723, 726 (2000); First Nationwide

5   Savings v. Perry, 11 Cal. App. 4th 1657, 1662-63 (1992).

6   Even under the more restrictive analysis of McBride, Plaintiff

7   sufficiently pleads claims for restitution against EA and CLC on

8   the theory that they obtained a benefit from him through their

9   alleged wrongful conduct.  His breach of contract claim against

10  NCAA does not bar these claims.  Although EA and CLC correctly note

11  that the existence of such a contract could bar a restitutionary

12  claim against a contracting party, it is not clear that his alleged

13  contract with NCAA defined any rights between him and EA and CLC.

14  Cf. Cal. Med. Ass'n v. Aetna U.S. Healthcare of Cal., 94 Cal. App.

15  4th 151, 172 (2001) (holding that "as a matter of law, a

16  quasi-contract action for unjust enrichment does not lie where, as

17  here, express binding agreements exist and define the parties'

18  rights").  Thus, Plaintiff has adequately stated his unjust

19  enrichment claim for restitution against EA and CLC.

20  VII.  EA's Anti-SLAPP Motion to Strike

21  Finally, EA moves under California Code of Civil Procedure

22  section 425.16 to strike all of Plaintiff's claims against it.

23  Section 425.16(b)(1), which addresses Strategic Lawsuits Against

24  Public Participation (SLAPP), provides,

25      A cause of action against a person arising from any act of
        that person in furtherance of the person's right of petition
26      or free speech under the United States or California
        Constitution in connection with a public issue shall be
27      subject to a special motion to strike, unless the court
        determines that the plaintiff has established that there is a
28      probability that the plaintiff will prevail on the claim.

20

United States District Court
For the Northern District of California

1   California anti-SLAPP motions are available to litigants proceeding

2   in federal court.   Thomas v. Fry's Elecs., Inc., 400 F.3d 1206,

3   1206 (9th Cir. 2005).   California courts analyze anti-SLAPP motions

4   in two steps.   "First, the court decides whether the defendant has

5   made a threshold showing that the challenged cause of action is one

6   arising from protected activity."   Equilon Enter. v. Consumer

7   Cause, Inc., 29 Cal. 4th 53, 67 (2002).   Second, the court

8   "determines whether the plaintiff has demonstrated a probability of

9   prevailing on the claim."   Id.

10   Assuming that the challenged causes of action arise from

11   protected activity, Plaintiff makes a sufficient showing of his

12   probability of success on the merits.   EA incorrectly argues that

13   Plaintiff has a substantial burden to show probability of success.

14   It maintains that the Court must apply "the same standard governing

15   motions for summary judgment, nonsuit, or directed verdict."   EA's

16   Mot. to Strike at 12.   However, this standard does not apply in

17   federal court.

18   "At the second step of the anti-SLAPP inquiry, the required

19   probability that [a party] will prevail need not be high."   Hilton,

20   580 F.3d at 888-89.   The "statute does not bar a plaintiff from

21   litigating an action that arises out of the defendant's free speech

22   or petitioning; it subjects to potential dismissal only those

23   actions in which the plaintiff cannot state and substantiate a

24   legally sufficient claim."   Id. at 888 (quoting Navellier v.

25   Sletten, 29 Cal. 4th 82, 93 (2002)) (quotation marks omitted).   In

26   Thomas v. Fry's Electronics, the case that provides that anti-SLAPP

27   motions are available to litigants proceeding in federal court, the

28   court stated that "federal courts may not impose a heightened

United States District Court
For the Northern District of California

1  pleading requirement in derogation of federal notice pleading

2  rules." 400 F.3d at 1207; see also Empress LLC v. City & County of

3  S.F., 419 F.3d 1052, 1056 (9th Cir. 2005) (holding that "a

4  heightened pleading standard should only be applied when the

5  Federal Rules of Civil Procedure so require"); Verizon, Inc. v.

6  Covad Commc'ns. Co., 377 F.3d 1081, 1091 (9th Cir. 2004) (holding

7  that procedural "state laws are not used in federal court if to do

8  so would result in a direct collision with a Federal Rule of Civil

9  Procedure" and noting that federal courts have "accordingly refused

10 to apply certain discovery-limiting provisions of the anti-SLAPP

11 statute because they would conflict with Fed. R. Civ. P. 56").

12      Under Federal Rule of Civil Procedure 8, Plaintiff has

13 sufficiently stated his claims against EA. Accordingly, the Court

14 denies EA's special motion to strike Plaintiff's claims as a SLAPP.

15                          CONCLUSION

16      For the foregoing reasons, the Court DENIES EA's Motion to

17 Dismiss (Docket No. 34), GRANTS NCAA's Motion in part and DENIES it

18 in part (Docket No. 48), DENIES CLC's Motion (Docket No. 47) and

19 DENIES EA's Motion to Strike (Docket No. 35). Plaintiff's claims

20 for violation of his Indiana right of publicity and breach of

21 contract against NCAA are dismissed with leave to amend. In

22 accordance with this Court's Order of January 15, 2010 on

23 consolidation, Plaintiff has thirty days from the date of this

24 Order to file a consolidated amended complaint. A case management

25 conference is scheduled for April 27, 2010 at 2:00 p.m.

26      IT IS SO ORDERED.

27 Dated: February 8, 2010

CLAUDIA WILKEN
United States District Judge

28

22